## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

REGINALD E. WOOD, JR. ,

      Plaintiff,

v.                                                    Case No: 8:22-cv-2431-CEH-AAS

NETFLIX, INC., ARK MEDIA
PRODUCTIONS LLC, ABDUR
RAHMAN MUHAMMAD, KELLY
WOOD, RACHEL DRETZIN and
PHIL BERTELSON,

      Defendants.

_____

## <u>ORDER</u>

This defamation action comes before the Court on Motions to Dismiss filed by Defendants Netflix, Inc. (Doc. 117); Ark Media Productions LLC, Rachel Dretzin, and Phil Bertelson (the "Ark Media Defendants") (Doc. 118); and Abdur Rahman Muhammad (Doc. 120). Plaintiff Reginald E. Wood, Jr. responds in opposition. Docs. 126–128. Defendants reply. Docs. 131, 132, 138.

Netflix and Muhammad argue for dismissal of the claims against them for lack of personal jurisdiction and failure to state a claim. The Ark Media Defendants argue that Plaintiff's claims should be dismissed because the statute of limitations has lapsed and that even if it had not, the alleged statements are non-actionable.

The Court, having considered the motions and being fully advised in the premises, will grant the Motions to Dismiss. First, the Court lacks personal jurisdiction

over Netflix under Florida's long-arm statute, and Defendant Muhammad based on principles of due process. The claims against the Ark Defendants are barred by the statute of limitations because New York is the state with the most significant relationship to the case and its one-year statute of limitations lapsed before the action was filed.

## STATEMENT OF FACTS[1]

### A. The Parties

Plaintiff Reginald E. Wood, Jr. is a citizen of Ruskin, Florida. Doc. 110 at 2 ¶ 2.  Defendant Netflix, Inc. is a Delaware corporation with its principal place of business in California. *Id.* ¶ 4.  Defendant Ark Media Productions LLC ("Ark Media") is a New York limited liability company that is domiciled in and has its principal place of business in New York.  *Id.* ¶ 3. Defendants Rachel Dretzin, co-founder of Ark Media, and Phil Bertelson, executive producer for Ark Media, are citizens of New York. *Id.* ¶¶ 7-8.[2] Defendant Abdur Rahman Muhammad is a citizen of Washington, D.C.  *Id.* ¶ 5. Finally, Defendant Kelly Wood is a citizen of South Carolina.[3] *Id.* ¶ 6.

---

[1] The facts are derived from Plaintiff's Second Amended Complaint (Doc. 110), the allegations of which the Court must accept as true in ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), *see Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983). The standard for evaluating personal jurisdiction is discussed separately later on.

[2] The Court refers to Ark Media, Dretzin, and Bertelson collectively as the "Ark Media Defendants."

[3] She is also the daughter of Raymond Wood, Plaintiff's cousin whose deathbed confession letter (revealed posthumously) led to the majority of the events and claims here. *Id.*

Netflix is the owner and distributor of a documentary series titled "Who Killed Malcolm X?" which was produced by Ark Media and executive-produced by Bertelson and Dretzin. *Id.* ¶¶ 3-4. Defendant Muhammad served as the "[h]ost and star of" the Series. *Id.* ¶ 5. Plaintiff alleges that Netflix and Ark Media have an ongoing relationship and are "in talks" regarding a second season. *Id.* ¶ 4.

## B. Background Facts

The historical event at the center of the series, the confession, and the news coverage cited by the Parties occurred more than six decades ago, when civil rights leader Malcolm X was assassinated in New York City on February 21, 1965.

The following facts serve as background to Plaintiff's claims. Doc. 110 at 7–16. Plaintiff's relationship with Defendants and claims against them arise from a confession letter of disputed authenticity that he revealed in 2021. According to Plaintiff, his late cousin Raymond Wood, a former New York Police Department ("NYPD") officer who worked undercover, penned a deathbed letter admitting to his role in the assassination. *Id.* In the letter, Raymond Wood allegedly implicated himself, the NYPD, and the FBI in the killing, writing that he was ordered to set up and arrest two of Malcolm X's bodyguards so that he would be unguarded the day of his murder. *Id.* at 8, 13–14.[4]

---

[4] Arguing that it bolsters the authenticity of the confession (a question not at issue in this Order), Plaintiff claims that two men who were arrested and later exonerated publicly confirmed his uncle's version of events. *Id.* at 13–14 ¶ 59. Separately, for purposes of citation to Plaintiff's Complaint, the Court notes here that he repeats certain paragraph numbers—when applicable, the Court cites the page number *and* paragraph number for clarity.

Plaintiff sets out the following interactions involving him and Defendants, in loose chronological order. On January 10, 2021, before Plaintiff's press conference, Bertelson and Dretzin met with him in Florida, where they attempted to "coerce" him to sign a contract that would transfer control of the "life rights" of Raymond A. Wood and the confession itself to them. *Id.* ¶¶ 27–28. The next day, "the defendants" (presumably again Bertelson and Dretzin) emailed Plaintiff a letter of intent proposing an agreement for his uncle's life rights and all documents related to the confession. *Id.* ¶ 29.

Plaintiff declined, stating that "there was no amount of money that would prevent [him] from first releasing the confession letter" as his uncle had requested. *Id.* That same day, Plaintiff informed Bertelson of his plans to stage a press conference with a prominent attorney and family members of Malcolm X at New York City's Audubon Ballroom, the site of the assassination. *Id.* ¶ 30. Plaintiff claims Bertelson contacted a representative of Malcolm X's and tried to derail the press conference by "uttering misinformation about the credibility of plaintiff's information." *Id.* ¶ 31. Nevertheless, the press conference went forward on February 20 and received extensive press coverage. *Id.* ¶ 32.

The following day, Bertelson and Dretzin again offered to buy the life rights and confession. *Id.* ¶¶ 33–34. Plaintiff requested a written proposal. *Id.* On February 26, a second proposed agreement was sent. *Id.* ¶¶ 40–43. Plaintiff declined, stating that he was working on a documentary that would "set the record straight." *Id.* That day, Kelly Wood appeared on a local New York news channel, where she stated that the

confession letter attributed to her father was "fake." *Id.* at 11 ¶ 44.  On February 27, Plaintiff sent the Ark Media Defendants a cease-and-desist letter pursuant to an NDA he had previously signed with them. *Id.* ¶¶ 31–32; *see* Doc. 53 at 10 ¶ 31.

On March 6, Bertelson allegedly called Plaintiff and asked, "[n]ow that you have been discredited by Kelly Wood are you ready to sell the rights to us?" *Id.* ¶ 45. Plaintiff responded by asserting that Kelly Wood had failed to discredit him and that he would move forward with his plans to produce a "more accurate documentary to rival the defendant's work." *Id.*

### C. Defamatory Statements and YouTube Videos

On March 14, 2021, Defendant Muhammad released two videos on YouTube discussing the confession letter. *Id.* at 11–15 ¶¶ 46–68. Plaintiff does not allege that the first video contained defamatory statements, but claims it "shows the motive of all defendants to conspire to defame [him] with actual malice." *Id.* ¶ 47. According to Plaintiff, the first video features Muhammad's "rants" about the confession letter harming his Netflix project and discrediting his theories about the true perpetrator of the assassination. *Id.* Muhammad also allegedly refers to himself, Ark Media, and Netflix as "we" in expressing his concerns about the letter. *Id.*

The second video, featuring Muhammad and Kelly Wood, contains the allegedly defamatory statements. *Id.* at 12–13 ¶¶ 49–57. Plaintiff asserts Muhammad "made statements of fact and never asked the audience to form their own opinion about his presentation of alleged facts and evidence about the plaintiff." *Id.* ¶ 50. Next,

he "falsely claim[ed] that the media told him that they did DNA testing on the letter and have proof that it is a fake." According to Plaintiff, however, the New York Times later confirmed that they never had possession of the letter. *Id.* ¶ 54. Finally, Kelly Wood and Muhammad falsely accused Plaintiff of absconding with his uncle's money and being forced into bankruptcy by a lawsuit his uncle filed against him. *Id.* at 13 ¶¶ 55–56.

Plaintiff claims this video was an "assault on [his] character, name, and reputation." Doc. 110 at 16 ¶ 41. In the video, Muhammad acknowledges his affiliation with Netflix and states that "the Ray Wood confession letter is a hoax," "fraudulent," and a "hoax, con, and scam." Additionally, Muhammad and Kelly Wood call Plaintiff a "low life character, run-of-the-mill con artist, and a bottom feeder," and state that he is "despicable, the worst, and an affront to the history of Malcolm X and the family of Malcolm X." *Id.* at 16–17 ¶¶ 43–47, 53. Muhammad also stated that "the media has done DNA testing" on the confession letter and determined it was a fraud. *Id.* ¶ 49.

Furthermore, Muhammad stated that his production company "wanted to get to the bottom of this" and was considering a second season of the Documentary. *Id.* ¶¶ 50–51. He went on to "admit[] that the plaintiff was in discussions with defendants Netflix and Ark Media to produce a season two." *Id.* ¶ 52. And Kelly Wood stated "that her co-defendants approached and invited her to participate in the conspiracy to defame the plaintiff." *Id.* ¶ 48.

Most of Plaintiff's claims arise from the second video—but there was another incident. That is a vague allegation that on February 16, 2021, "Defendant" (which Defendant is unclear) "disclosed confidential information to unauthorized persons." *Id.* at 18 ¶ 54. That same day, Bertelson also allegedly disclosed confidential information to "unauthorized persons" and the Ark Media Defendants "uttered intentional falsehoods" to representatives of Malcolm X's family. *Id.* at ¶¶ 55–57.

Finally, Plaintiff adds new background allegations in the Operative Complaint, for which he was granted leave to amend (*see* Docs. 102, 109). Specifically, he alleges that a witness present on the day of the assassination saw Raymond Wood running out of the Audubon Ballroom. Additionally, two men named in the confession letter admitted that they were set up and arrested in a fake bomb plot on February 16, 1965, to prevent them being present on the day of the assassination. Doc. 110 at 13–14.

**D. Procedural Background**

Plaintiff filed this action in October 2022 (Doc. 1) and a First Amended Complaint in May 2023 (Doc. 53). Subsequently, on the basis of newly discovered evidence, Plaintiff moved for leave to amend his complaint (Doc. 102), which was granted (Doc. 109). He filed the operative "Second Amended Complaint" in May 2024. Doc. 110.

Plaintiff brings five counts against Defendants: defamation *per se* against all Defendants based on the disclosure of confidential information and utterance of "misinformation" to Malcolm X's family and the YouTube comments (Count One); conspiracy to defame for conspiring to publish the Video and share it on social media

(Count Two); defamation *per se* for acting with knowledge or reckless disregard as to the truth in publishing the Video (Count Three); defamation *per quod* for acting with knowledge or reckless disregard as to the truth in publishing the Video (Count Four); and intentional infliction of emotional distress for intentionally or recklessly inflicting emotional distress upon Plaintiff by publishing the YouTube Video (Count Five). Doc. 110 at 21–33 ¶¶ 64–124.

### E. Jurisdictional Allegations

Additionally, Plaintiff includes the following jurisdictional allegations.

#### 1. *Netflix*

First, he alleges that personal jurisdiction over Netflix is proper because his claims arise from Netflix's "operating, conducting, engaging in, or carrying on a business venture in this state" and "continuously and systematically do[ing] business in  Florida by streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website, engaging in film production activities in Florida, and premiering its original content in Florida." *Id.* ¶¶ 10–11.

#### 2. *Ark Media Defendants*

Plaintiff asserts that the Court has personal jurisdiction over the Ark Media Defendants because "Ark Media, Rachel Dretzin, and Phil Bertelson traveled to Ruskin Florida to meet with [him] upon committing the tortious act within the state, while attempting to obtain and secure the property belonging to [P]laintiff." *Id.* ¶ 13. He cites Fla. Stat. § 48.193(1)(a)(6) in support of jurisdiction based on the action

arising from the Ark Media Defendants "causing injury to persons . . . within this state arising out of an act or omission by the defendant[s] outside this state" and "at or about the time of the injury" they were "engaged in solicitation or service activities within the state" and "products . . . processed, serviced, or manufactured by the defendant[s] anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use." *Id.* ¶¶ 12–13, 19–22.

### 3. *Abdur Rahman Muhammad*

Plaintiff alleges that the Court has personal jurisdiction over Muhammad because, pursuant to Fla. Stat. § 48.193(2), he "is engaged in substantial and not isolated activity within Florida" and "produced and broadcasted a YouTube Live Video accessed and viewed in Florida (by Florida residents), including members of the Plaintiffs' community." *Id.* ¶¶ 14–15. Plaintiff also alleges that Muhammad offers an online course on the Malcolm X assassination available in Florida. *Id.* ¶ 16.

## LEGAL STANDARD

### A. Personal Jurisdiction

Personal jurisdiction "concern[s] the extent of a court's power over the parties and the fairness of requiring a party to defend itself in a foreign forum." *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 857 (11th Cir. 1988). It "represents a restriction on judicial power . . . as a matter of individual liberty." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, 119 S. Ct. 1563, 1570, 143 L.Ed. 2d 760 (1999) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702,

102 S.Ct. 2099, 72 L.Ed.2d 492, (1982)). Thus, the court must dismiss an action against a defendant over which it lacks personal jurisdiction. *Smith v. Trans–Siberian Orchestra*, 689 F. Supp. 2d 1310, 1312 (M.D. Fla. 2010) (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999)).

Motions to dismiss for lack of personal jurisdiction are governed by Federal Rule of Civil Procedure 12(b)(2). To withstand such a motion, a plaintiff must plead sufficient facts to establish a *prima facie* case of jurisdiction over the nonresident defendant. *See id.* at 1313; *Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 625 (11th Cir. 2010).

The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). But if the defendant refutes personal jurisdiction by challenging the plaintiff's allegations through affidavits or other competent evidence, the plaintiff must substantiate its jurisdictional allegations through affidavits, testimony, or other competent evidence of its own. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). Ultimately then, he or she must establish by a preponderance of the evidence that the court has jurisdiction over each defendant. *Trans–Siberian Orchestra*, 689 F. Supp. 2d at 1312. The district court makes all reasonable inferences in favor of the plaintiff when confronted with conflicting evidence. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010); *Consol. Dev. Corp.*, 216 F.3d at 1291.

### B. Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Further, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.  Although a *pro se* litigant's pleadings are held to a less stringent standard, they must still meet minimal pleading standards. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Olsen v. Lane*, 832 F. Supp. 1525, 1527 (M.D. Fla. 1993).

### C. Choice of Law

"A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.,* 485 F.3d 1233, 1240 (11th Cir. 2007).  Thus, Florida choice of law rules apply to this matter. Consequently,

the "most significant relationship" test applies to tort claims. *Green Leaf Nursery v. E.I.
DuPont De Nemours & Co.,* 341 F.3d 1292, 1301 (11th Cir. 2003).

In applying this test, courts consider a variety of factors, including "(a) the place
where the injury occurred, (b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of
the parties, and (d) the place where the relationship, if any, between the parties is
centered." *Id.* (citations and quotation marks omitted). No single factor controls, and
the Court's ultimate decision is based on the totality of the circumstances. *See e.g., Nix
v. ESPN, Inc.,* 772 F. App'x 807, 812 (11th Cir. 2019).

Under Section 95.10, Florida Statutes, "[w]hen the cause of action arose in
another state . . . and [the state's] laws forbid the maintenance of the action because
of lapse of time, no action shall be maintained in this state." "The purpose of the
statute is to discourage 'forum shopping' and the filing of lawsuits in Florida that have
already been barred in the jurisdiction where the cause of action arose." *Celotex Corp.
v. Meehan,* 523 So. 2d 141, 143 (Fla. 1988).

## DISCUSSION

After careful consideration, Plaintiff's claims are due to be dismissed as against
each of the moving Defendants, albeit for different reasons.

As to Netflix, Plaintiff fails to establish personal jurisdiction. Critically, he does
not allege a plausible causal connection between Netflix's business activities in Florida
and his claims. Plaintiff's jurisdictional allegations as to Netflix's activities in Florida
concern streaming, subscribers, film production, and other content-related business.

As to the defamation claims, Plaintiff alleges that Netflix was not only aware of, but an active participant in making the YouTube video and he alleges a broader conspiracy to defame him and derail his opportunities of striking a production deal on his own.

In response, Netflix's sworn statement unambiguously states that it had no role in producing the series, no involvement in the YouTube video, and no direct dealings with the Ark Media Defendants at all. Moreover, Netflix's representative affirms that nobody affiliated with Netflix was involved in or aware of discussions between Ark Media and Plaintiff. In response, Plaintiff submits nothing more than speculation and conclusory allegations. Therefore, he fails to meet his burden of establishing jurisdiction under Florida's long-arm statute.

Nor does Plaintiff establish that personal jurisdiction is proper over Defendant Muhammad. His sole jurisdictional allegation in the Complaint is that Muhammad is subject to general jurisdiction in Florida, in contradiction of Plaintiff's own allegations in the operative complaint and Muhammad's sworn affidavit. Plaintiff also puts forward a conclusory argument that specific personal jurisdiction is proper over Muhammad based on his Florida contacts. However, the Court agrees with Muhammad that based on his sworn declaration, Plaintiff's allegations, and the law of this Circuit, Plaintiff fails to meet his burden of pleading purposeful availment.

Finally, the claims against the Ark Media Defendants are due to be dismissed because they are time-barred. The relevant issue is whether New York's one-year statute of limitations applies, or Florida's two-year statute of limitations. This, in turn, depends on which state has the most significant relationship to the case. Plaintiff

argues that Florida has a more significant relationship to this case than New York. However, the Court agrees with Defendants that the totality of the relevant factors, contacts, and the special considerations for multistate defamation cases support a conclusion that New York has the most significant relationship to the case, which means the claims against the Ark Media Defendants are time-barred.

### A. Judicial Notice

The Court begins with the request for judicial notice filed by Netflix and the Ark Media Defendants in support of their Motions to Dismiss (Doc. 119). They ask that the Court take judicial notice of and consider the contents of an attached non-disclosure agreement ("NDA", *see* Doc. 119-2) referenced in the original complaint and previous Amended Complaint. They also ask that the Court take judicial notice of the video posted to YouTube on March 14, 2021, which, was submitted to the Court via thumb drive, and serves as the basis for most of the defamation claims, as well as the various news articles cited in the Motions to Dismiss. *Id.* at 1–2.

In ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint." *Austin v. Modern Woodman of Am.,* 275 F. App'x 925, 926 (11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.,* 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). However, it may consider attachments or exhibits provided with the complaint. *See Gill as Next Friend of K.C.R. v. Judd,* 941 F.3d 504, 511 (11th Cir. 2019) ("The Civil Rules provide that an attachment to a complaint generally becomes 'part of the pleading for all purposes,' Fed. R. Civ. P. 10(c), including for ruling on a motion to dismiss."). A district court can also take judicial notice of an

adjudicative fact that is "not subject to reasonable dispute" and either (1) "generally known within the trial court's territorial jurisdiction" or (2) capable of being "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.,* 869 F.3d 1204, 1224–25 (11th Cir. 2017) (quoting Fed. R. Evid. 201(b)).

As to the NDA and the fact that it includes a New York choice of law provision, Defendants argue judicial notice would be appropriate because Plaintiff previously alleged that he entered into the agreement with the Ark Media Defendants.[5]

Further, Defendants argue that in Plaintiff's *proposed* Second Amended Complaint (Doc. 102-1), he removed the direct allegation that he and the Ark Media Defendants entered into the NDA but retained allegations that it had been violated. Ultimately, however, they contend that Plaintiff improperly deleted these allegations in the Second Amended Complaint filed with the Court. *See* Doc. 119 at 2–3; Doc. 110. They argue that these prior allegations and the proposed NDA may be considered in light of Plaintiff's selective removal of prior allegations to avoid application of New York law to this case. *Id.* at 3. Plaintiff does not clearly argue that judicial notice would be improper in this case, but responds that the NDA is unexecuted, unsigned, and "not actionable" in this complaint because his claims are not based on a violation of the NDA. Doc. 128 at 10. Moreover, he argues that the Parties "agreed to change the

---

[5] Plaintiff's First Amended Complaint did include this specific allegation. Doc. 53 at 9 ¶ 25.

venue state to Florida" on the document before it was signed, although he provides no evidence of this. *Id.*

As Plaintiff states in his response, the NDA attached by Defendants appears to be an unsigned draft. Upon review of the exhibit and the Parties' arguments, the Court cannot affirmatively determine that the contents of the NDA (such as the New York choice of law provision that Defendants argue governed the agreement) are "not subject to reasonable dispute" and therefore it will not take judicial notice of its contents.[6] *Grayson*, 869 F.3d at 1224–25.

However, judicial notice and consideration of the YouTube video and the statements therein is appropriate as it was submitted by both sides, its authenticity has not been questioned, and it is "repeatedly referenced" in the Operative Complaint. *See, e.g., Alticor Inc. v. UMG Recordings, Inc.,* No. 6:14-CV-542-RBD-DCI, 2014 WL 12873476, at *6–7 (M.D. Fla. July 18, 2014).

Finally, the Court agrees that judicial notice of the existence of the news articles would be appropriate under Federal Rule of Evidence 201(b) in evaluating whether or not a Plaintiff is a "public figure"—and therefore, whether the actual malice standard applies. *See Turner v. Wells,* 879 F.3d 1254, 1272 n.5 (11th Cir. 2018). Plaintiff's responses (Docs. 126–128) contain no counterargument, and he himself refers to widespread news coverage and specific articles throughout his Complaint and

---

[6] This point is relevant to the Ark Media Defendants' Motion to Dismiss, in which it argues that the forum selection clause is a reason New York has the most significant relationship to this case and its law should be applied. As discussed *infra,* the Court agrees that New York law applies, although it does not consider the NDA in reaching this conclusion.

responses. Therefore, this final portion of Defendants' request for judicial notice is granted, and the Court takes judicial notice of the existence of the news articles (Docs. 117, 118), though not for the truth of their contents.

## B. Personal Jurisdiction

Plaintiff fails to establish personal jurisdiction over Netflix or Muhammad. To determine whether personal jurisdiction over an out-of-state defendant is proper, a trial court undertakes a two-step analysis. *Cable/Home Commc'n Corp. v. Network Prod., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990).

First, it must determine whether the plaintiff has alleged sufficient facts to subject the defendant to the forum state's long-arm statute. *See Future Tech.*, 218 F.3d at 1249. Second, if the court determines that the forum state's long-arm statute has been satisfied, the court must then decide whether exercising jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* In determining whether jurisdiction comports with the Due Process Clause, the court must ask "(1) whether [the] defendant has established sufficient 'minimum contacts' with the [forum state]; and (2) whether the exercise of this jurisdiction over [the] defendant would offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Only if both prongs of the Due Process analysis are satisfied may this Court exercise personal jurisdiction over a nonresident defendant. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir. 1996) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *Int'l Shoe*, 326 U.S. at 316).

*Netflix*

Netflix argues that Plaintiff has not established personal jurisdiction under Florida's long-arm statute or the principles of due process. *Id.* at 9–16. As to the long-arm statute, Netflix contends that Plaintiff fails to allege any causal connection between his claims and Netflix's activities in Florida. *Id.* at 9–12. Further, it asserts that Plaintiff did not argue for conspiracy-based personal jurisdiction—and even if he had, such an argument would fail because he does not allege that Netflix was part of a "Florida-based agreement." *Id.* at 12–14. Finally, Netflix argues that the exercise of personal jurisdiction over it would not comport with due process requirements. *Id.* at 14-17. This is so, Netflix argues, because Plaintiff fails to tie his claims to Netflix's contacts with Florida or demonstrate purposeful availment.[7]

In support of its arguments, Netflix submits the sworn declaration of Kia Hudson, its Director of Business and Legal Affairs, Nonfiction. *See* Doc. 117-1. Ms. Hudson states that Netflix is incorporated in Delaware, has its principal place of business in California, and does not maintain any Florida offices. *Id.* at 1. Further, she states that even in licensing the rights to the "Who Killed Malcolm X" series, Netflix had no direct dealings with Ark Media and only interfaced with a third-party

---

[7] Additionally, Netflix contends that the Complaint should be dismissed for failure to state a claim. *Id.* at 17–24. It first argues that the claims are time-barred by New York's statute of limitations. *Id.* at 17–19. Additionally, it argues that the statements in the Video cannot be attributed to Netflix, and Plaintiff does not allege Netflix made any other statements about him. *Id.* at 19–21. Finally, Netflix asserts that the statements in the Video are not actionable because they constitute protected opinion, and that Plaintiff fails to allege actual malice. *Id.* at 21–24. The Court does not reach these arguments because Plaintiff fails to establish personal jurisdiction.

company, Fusion Media Network, LLC. *Id.* at 2. Additionally, Netflix had no role in on-the-ground production and no Netflix employee or representative worked with Ark Media. *Id.*

Further, she states that Netflix has not been involved in discussions regarding a potential sequel to the Series, nor has anyone from the company spoken to Ark Media or any of the other co-defendants about such a project. *Id.* As to the YouTube video containing the bulk of the allegedly defamatory statements, Ms. Hudson states that Netflix was not involved in its preparation or distribution, and that no representative or employee of Netflix had knowledge of it before it was posted. *Id.* at 3. And, based on a records review, Netflix never had a contractual agreement with Defendants Muhammad or Kelly Wood related to the series or YouTube video. *Id.* Finally, nobody at Netflix was involved in or privy to discussions between Plaintiff and Ark Media, nor were there discussions with Ark Media about Plaintiff's 2021 press conference. *Id.* at 3–4.

Plaintiff responds in opposition. Doc. 128. He argues that the statements in the YouTube video are attributable to Netflix because it distributed the documentary and had a motive to conspire against him.  Doc. 128 at 5–8. He also speculates that because Netflix worked with Ark Media on other series, "Ark Media and Netflix executives may have conspired to protect their reputations and business relationships" considering the confession letter. *Id.* at 7. And he argues that personal jurisdiction over Netflix would be proper under several provisions of Florida's long-arm statute. First, because Netflix conducts substantial business in Florida through streaming services,

subscription offerings, and film production activities. *Id.* at 7–8. Moreover, Plaintiff emphasizes that initial negotiations with the Ark Media Defendants regarding the confession took place in Florida, where they traveled to meet with him. *Id.* Plaintiff also takes issue with Netflix's reliance on the Declaration, arguing that Ms. Hudson became Netflix's Director of Business and Legal Affairs in January 2022, fourteen months after the relevant events. *Id.* at 12–13. He contends that her statements are not based on personal knowledge and should be disregarded or given minimal weight. *Id.*

To substantiate his own claims, Plaintiff presents "evidence" in the form of assertions that Raymond Wood's confession letter has been authenticated, that affidavits from witnesses to Malcolm X's murder have been received, and that individuals named in the confession have since been exonerated. *Id.* at 11. Plaintiff concludes with a request that the Court deny Netflix's motion to dismiss and, alternatively, if it considers the Declaration, that he be permitted to conduct discovery regarding her statements before any ruling on the motion. *Id.* at 14.

In reply, Netflix contends that Plaintiff fails to meet his burden of establishing personal jurisdiction under Florida's long-arm statute. *See* Doc. 132. It argues that Plaintiff consistently relied solely on Florida Statute § 48.193(1)(a)(1) in his complaints, but presents no "causal connection" between Netflix's Florida business activities and his claims. *Id.* at 2. Netflix further argues that Plaintiff's newly-asserted jurisdictional arguments under §§ 48.193(1)(a)(2), 48.193(1)(a)(6), and 48.193(2) are improperly brought in his response and due to be rejected in any case, as Netflix's

sworn declaration clearly states that no employee had knowledge of any interactions between other defendants and Plaintiff. *Id.* at 3–4.

Netflix also argues that Plaintiff has not demonstrated a factual basis for conspiracy-based jurisdiction. *Id.* at 2. It emphasizes that he relies on unpleaded allegations to argue that "Netflix had a motive to discredit" him and that no Florida-based agreement could exist given that only connection to Florida is Plaintiff's residence. *Id.* Moreover, Netflix notes that Plaintiff fails to address the due-process portion of its jurisdictional argument and has thus conceded those points. *Id.* at 4.

Netflix also defends the validity of Ms. Hudson's declaration. It responds that Plaintiff's attacks are without merit because personal knowledge based on review of files and records is a proper basis for such a declaration. *Id.* at 4–5. Thus, Netflix argues it has demonstrated a sufficient foundation for Ms. Hudson's statements about the development of the Series and the lack of discussions with co-Defendants. *Id.* at 5. Finally, Netflix contends that Plaintiff's request for jurisdictional discovery is procedurally and substantively deficient. *Id.* at 5–6. It points out that he failed to file a separate motion for discovery and does not demonstrate any genuine dispute on material jurisdictional facts. *Id.*

*General Jurisdiction*

First, Netflix is correct that to the extent Plaintiff alleges general jurisdiction (under Fla. Stat. § 48.193(2)), any such argument fails because Netflix is not incorporated in Florida, nor is Florida its principal place of business. *See* Doc. 117 at 9 n.1 (citing *Daimler AG v. Bauman,* 571 U.S. 117, 122 (2014)).

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This, for corporations, exists in the equivalent of that corporation's domicile—a place where the corporation is fairly regarded as at home. *Brown*, 564 U.S. at 924. "The 'paradigm' forums in which a corporate defendant is 'at home' . . . are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler A.G. v. Bauman*, 571 U.S. 117, 138 (2014)). Nonetheless, general jurisdiction is not limited to such forums and may extend in exceptional cases to a forum where the corporation's operations are "so substantial and of such a nature as to render the corporation at home in that state." *Id.* (quoting *Daimler*, 571 U.S. at 138–139).

Here, as alleged in the Complaint, Netflix is incorporated in Delaware and has its principal place of business in California. *See* Doc. 110 at 3 ¶ 4. No argument is made that Netflix's operations are otherwise so substantial as to render it at home in Florida. Therefore, the Court cannot exercise general personal jurisdiction over Netflix. Plaintiff has the burden of establishing specific personal jurisdiction.

*Specific Jurisdiction - Carrying on a Business or Business Venture in Florida*

Plaintiff first attempts to establish *specific* personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1) (2023). Doc. 53 ¶ 10. Under this statute, a defendant submits itself to specific personal jurisdiction in Florida for any cause of action arising from its

"operating, conducting, engaging in, or carrying on a business or business venture in [Florida]." Fla. Stat. § 48.193(1)(a)(1) (2023).

A plaintiff establishes that a defendant is carrying on a business or business venture in the state if the activities of the defendant, when considered collectively, "show a general course of business activity in the State for pecuniary benefit." *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 627 (11th Cir. 1996) (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So.2d 561, 564 (Fla. 1975)). "That requirement can be satisfied either by (1) 'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit or' (2) 'doing a single act for such purpose with the intention of thereby initiating a series of such acts.'" *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 783–84 (11th Cir. 2014) (quoting *Wm. E. Strasser Constr. Corp. v. Linn*, 97 So. 2d 458, 460 (Fla. 1957)).

But that is not all Plaintiff must establish. In making his case that the court has personal jurisdiction over Netflix, he must allege a "causal connection between the defendant's activities in the forum state and the plaintiff's cause of action." *Piazenko v. Pier Marine Interiors GMBH*, 314 So. 3d 438, 444 (Fla. 2d DCA 2020); *see also* Fla. Stat. § 48.193(1)(a) (2023) (allowing jurisdiction "for any cause of action *arising from* any of the following acts") (emphasis added).

Courts have long held that Florida's long-arm statute "requires a direct affiliation, nexus, or substantial connection to exist between the basis for the cause of action and the business activity." *Hinkle v. Cirrus Design Corp.*, 775 F. App'x 545, 550 (11th Cir. 2019) (citations omitted); *Damoth v. Reinitz*, 485 So.2d 881, 883 (Fla. 2d

DCA 1986).  Accordingly, specific personal jurisdiction is lacking where the cause of action is not substantially connected to the defendant's business activities in Florida. *See, e.g.*, *Kenfred Enterprises, LLC v. Textron Aviation, Inc.*, 2021 WL 1020969, *3 (M.D. Fla. Mar. 17, 2021) (holding that there was no personal jurisdiction over a defendant where the plaintiff did not allege any connection between defendant's breach of contract and its offices and service centers in Florida, and the harm to plaintiff arose from defendant's activity outside of Florida).

In this case, Netflix's Florida-based activities—"streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website, engaging in film production activities in Florida, and premiering its original content in Florida"—are not connected to the bases for Plaintiff's claims, which are allegedly defamatory statements made in Muhammad's Video, the disclosure of confidential information to a representative of Malcolm X's family, and a vaguely outlined "conspiracy to defame." Doc. 110 at 4, 16–19 ¶¶ 41–58.

Instead of tying Netflix's Florida-based activities to his claims, Plaintiff responds by challenging the validity of the sworn declaration and also raises a number of new bases for jurisdiction. *See* Doc. 128. Plaintiff's argument is unavailing, as are the new bases for jurisdiction.

First, he fails to explain how Netflix's Florida content streaming, subscriptions, productions, and premiers are tied to any of the defamatory statements or causes of action. These are the only business activities of Netflix he alleges (Doc. 110 ¶ 11), but

none of his claims are based on the content of its programming or acts related to production, streaming, or premiering of Netflix content.

Thus, based on the pleadings, Netflix's sworn declaration, and Plaintiff's response, there is no connection between these acts and any activities of Netflix in Florida—and therefore no "direct affiliation, nexus, or substantial connection . . . between the basis for the cause of action and the business activity." *Hinkle,* 775 F. App'x at 550.

Moreover, considering Netflix's declaration attesting to the fact that its representatives were not involved in production or contractual discussions for the series at all, much less within Florida, the burden shifts to Plaintiff to present evidence in favor of jurisdiction. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). Establishing jurisdiction in the face of such evidence requires the Plaintiff to "substantiate [his] jurisdictional allegations by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *United Techs. Corp.*, 556 F.3d at 1274. Here, Plaintiff submits no such evidence, and therefore his first basis for jurisdiction, § 48.193(1)(a)(1), is unavailing.[8]

---

[8] Plaintiff's challenges to the foundation for Netflix's sworn declaration are without merit. As Netflix argues on reply (Doc. 132 at 4–6), "personal knowledge can be based on a review of relevant business files and records." *Del Rosario v. Labor Ready Se.,* 124 F. Supp. 3d 1300, 1316 (S.D. Fla. 2015) (quoting *Duke v. Nationstar Mortg.,* 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012)); *see also Mid-Continent Cas. Co. v. Don Brady Constr.,* 2012 U.S. Dist. LEXIS 63791, at *6 (S.D. Ala. May 7, 2012) ("As a matter of law, personal knowledge can come from the review of the contents of business files and records."). Netflix's employee stated that her basis for the declaration was "personal knowledge" or "based on a review of available information." *See* Doc. 117-1. This is a sufficient basis for her statements about the

*Specific Jurisdiction - Other Statutory Bases*

In his Response, Plaintiff invokes several other grounds for jurisdiction under Florida law as well. Doc. 128 at 8–9 (citing Fla Stat. §§ 48.193(a)(2), (a)(6), 48.193(2)). None apply.

First, as discussed *supra*, there is no basis for general jurisdiction over Netflix in Florida under § 48.193(2).

Nor does Plaintiff meet his burden of establishing that jurisdiction is proper under Fla. Stat. § 48.193(1)(a)(2), which applies to the commission of a tortious act in Florida. Plaintiff argues that jurisdiction under this statute would be proper based on Netflix and Ark Media's conspiracy within the state. Doc. 128 at 8.

Section 48.193(1)(a)(2) provides that a nonresident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from . . . [c]ommitting a tortious act within [Florida]." Fla. Stat. § 48.193(1)(a)(2) (emphasis added). Accordingly, Plaintiff must show that his defamation claims arose from Netflix's commission of "a tortious act within" Florida. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013).

However, as already noted, none of Plaintiff's allegations regarding Netflix's Florida-based activities (streaming services, premiers, etc.) are related to the claims in this case, and Plaintiff submits no competent evidence in response to the sworn declaration stating that Netflix and its employees: (1) had no role in the production of

---

development of the series and whether discussions had been had with any co-Defendants about the project.

the documentary or direct relationship with Ark Media; (2) had no involvement whatsoever in the YouTube video; and (3) had no involvement in or knowledge of discussions between Ark Media and Plaintiff. Doc. 117-1 at 1–4. Because Plaintiff submits no competent evidence of a tortious act that Netflix committed in Florida, he fails to establish that § 48.193(1)(a)(2) is a valid basis for jurisdiction. *Future Tech. Today, Inc,* 218 F.3d at 1249.

Finally, under Fla. Stat. § 48.193(1)(a)(6), specific jurisdiction is proper over a nonresident defendant whose out-of-state actions caused injury in Florida if: (a) the defendant is engaged in solicitation or service activities within the state; or (b) products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. Plaintiff argues in his response that this statute applies to Netflix with no further elaboration, factual analysis, or competent evidence. Doc. 128 at 8.

Again, however, the Operative Complaint contains no allegations that would tie Netflix's Florida activities to Plaintiff's claims. *See United Techs. Corp.*, 556 F.3d at 1274. None of the activities listed in the complaint or Plaintiff's response are related to the YouTube video or the conversation with Malcolm X's family. Therefore, in light of Netflix's sworn declaration and Plaintiff's failure to present any competent evidence in response, Plaintiff's argument for jurisdiction on this basis must be rejected.

For those reasons, Plaintiff fails to plead sufficient facts to establish personal jurisdiction over Netflix. Because he has not satisfied the first step of the personal-

jurisdiction inquiry, the Court will not conduct the due process analysis, as he must satisfy both steps. *See Posner*, 178 F.3d at 1214. Moreover, as Netflix points out, Plaintiff's opposition brief fails to address the due-process limits imposed on the exercise of specific personal jurisdiction in response to its Motion to Dismiss. Thus, even if there were a *statutory* basis for jurisdiction (and there is not), the operative Complaint would be dismissed because the exercise of that jurisdiction would violate due process.

*Conspiracy-Based Personal Jurisdiction*

Separately, Netflix argues that even if Plaintiff had expressly alleged conspiracy-based personal jurisdiction, he fails to demonstrate a factual basis for it. *See* Doc. 117 at 12–14, Doc. 132 at 2. In short, it contends that Plaintiff does not unambiguously and plausibly allege that it entered into a Florida-based agreement with the other Defendants which would give this Court jurisdiction. Doc. 132 at 2. Netflix argues that this conclusion is inescapable given its unrebutted declaration that it had no knowledge of the Ark Media Defendants' interactions with Plaintiff until this case was filed. *Id.*; Doc. 117-1. Plaintiff responds by speculating about Netflix's motive to discredit him and a theory that it "may" have entered into a conspiracy with the other Defendants. Doc. 128 at 6–7.

Plaintiff does not establish conspiracy-based personal jurisdiction because he fails to unambiguously allege that Netflix was part of a "Florida-based agreement" to defame him. *United Techs. Corp.*, 556 F.3d at 1281-82 ("[Florida's] long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-

conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." (internal citation omitted)). While he makes a conclusory allegation that Netflix participated in a "conspiracy to defame," he fails to articulate how this conspiracy was based in Florida such that it could provide grounds for conspiracy-based personal jurisdiction under Section 48.193(1)(a)(2). [9]

In sum, the complaint does not allege viable facts from which an inference could reasonably be drawn that Netflix was part of a conspiracy either engineered in Florida or pursuant to which a tortious act in furtherance was committed in Florida. Thus, Netflix is not subject to conspiracy-imputed personal jurisdiction under Florida's long-arm statute. *United Techs.* Corp, 556 F.3d at 1283; *see Arch Aluminum & Glass Co. v. Haney,* 964 So.2d 228, 234–35 (Fla. 4th DCA 2007) (finding no personal jurisdiction where neither the conspiracy nor the underlying tort occurred in Florida).

Finally, the Court agrees that Plaintiff's request for jurisdictional discovery is procedurally (and substantively) deficient and due to be rejected. *See* Doc. 132 at 5–6. First, it was not made in a separate motion. *Hinkle v. Cont'l Motors*, 268 F. Supp. 3d 1312, 1327-28 (M.D. Fla. 2017). Next, Plaintiff fails to raise a genuine dispute on a material jurisdictional fact, as he must. *Id.* at 1328. Instead, his speculation as to what

---

[9] Additionally, as Netflix points out, the Eleventh Circuit's standard for plausibly pleading a conspiracy demands more than "conclusory, vague, and general allegations." *See Kearson v. S. Bell Tel. & Tel. Co.* 763 F.2d 405, 407 (11th Cir. 1985). Here, however, Plaintiff alleges only that the Defendants "conspired together" to publish a video and share it on YouTube. Doc. 110 ¶¶ 85–86. This is vague, short on detail, and fails to meet the standard.

"discovery may reveal" about Netflix's declaration and alleged role in the conspiracy is insufficient. Doc. 128 at 14. Plaintiff provides no basis to suggest that further discovery would result in evidence that would refute any part of the declaration, and he submits no competent evidence rebutting the statements in the declaration, as he must in order to state a basis for further discovery. *See Hinkle*, 268 F. Supp. 3d at 1328.

Thus, the claims against Netflix will be dismissed, without prejudice, for lack of jurisdiction. *See Morris v. SSE, Inc.*, 843 F.2d 489, 496 n.11 (11th Cir. 1988) ("Dismissal for lack of personal jurisdiction is without prejudice and the plaintiff still may sue the defendant in a forum where personal jurisdiction can be obtained."). Having determined that long-arm jurisdiction does not exist, the Court need not address whether the exercise of jurisdiction would offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### *Abdur Rahman Muhammad*

In the Complaint, Plaintiff pleads that Muhammad is a citizen of Washington, D.C., subject to the personal jurisdiction of Florida courts "[p]ursuant to Section 48.193(2), Florida Statutes, because [he] is engaged in substantial and not isolated activity within Florida, and therefore, [he] is subject to the jurisdiction of the court of this state." Doc. 110 at 5 ¶ 15. Plaintiff also alleges that Muhammad "produced and broadcasted a YouTube Live Video accessed and viewed in Florida by Florida residents, including members of the Plaintiffs' community." *Id.*

Defendant Muhammad moves to dismiss for lack of personal jurisdiction and failure to state a claim. Doc. 120 at 2. Again, the Court must first address personal

jurisdiction. *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir. 1990). Muhammad argues that the Court may not exercise personal jurisdiction over him because the YouTube Video was recorded and published in Washington, D.C.—where he lives—and because he has traveled to Florida only three times in the last fifteen years and has not purposefully availed himself of the privilege of conducting business in Florida. *Id.*

In response, Plaintiff argues that personal jurisdiction over Muhammad is proper because his YouTube channel is broadcast nationally and in Florida, he visited Florida as recently as 2020, and he has not "proven" that he lives in Washington, D.C.[10] Doc. 126 at 1-2. Further, Plaintiff argues that Muhammad, in his broadcast, solicited Florida residents to sign up for an online course on the assassination. *Id.* at 2. Plaintiff also argues that Muhammad has traveled to several Florida cities to promote the "Who Killed Malcolm X?" documentary series. *Id.* at 3.

In reply, Muhammad argues that the Court should disregard any new factual assertions in favor of personal jurisdiction. Doc. 138 at 1–2. Additionally, he contends that neither general nor specific personal jurisdiction over him would be proper—even considering the new allegations. *Id.* at 2–4.

First, Muhammad highlights his sworn declarations to the fact that he is domiciled in Washington, D.C., where the YouTube video was recorded and published, has never owned property in Florida or lived in Florida, has only rarely

---

[10] This argument contradicts Plaintiff's own complaint, given that he has alleged that Muhammad is a resident or citizen of Washington, D.C., in every complaint he has filed in this case, including the operative complaint. *See* Docs. 1, 53, 110.

traveled to Florida for brief periods of time, and that his online course does not target
Florida residents. *Id.* at 2. Additionally, he argues that *Moore v. Cecil*, 2024 WL
3590655 (11th Cir. July 31, 2024), a recent unpublished Eleventh Circuit decision,
definitively shows that specific personal jurisdiction would not be proper.

Linking his sworn declarations to *Moore*, Muhammad argues that he has
submitted evidence that the video is not directed to Florida or Florida residents and
that any assertions regarding his visits to Florida are unpleaded allegations that must
be disregarded. *Id.* at 4 n.1. Even if taken under consideration, Muhammad argues
they: (1) would not establish general jurisdiction and (2) do not relate to Plaintiff's
claims against him such that specific jurisdiction would be proper.

### a. General Personal Jurisdiction

Plaintiff's sole jurisdictional allegation as to Muhammad in the Complaint is
that general personal jurisdiction is proper under Section 48.193(2) because
Muhammad is engaged in "substantial and not isolated activity in Florida." Doc. 110
¶ 15.

Florida courts construe this phrase to mean "continuous and systematic
business contact" with the state. *See Caiazzo v. American Royal Arts Corp.*, 73 So. 3d 245,
250 (Fla. 4th DCA 2011). When general jurisdiction is established district courts may
broadly hear claims against out-of-state defendants whose "affiliations with the State
are so 'continuous and systematic' as to render them essentially at home in the forum
State." *Daimler*, 571 U.S. at 127 (quoting *Goodyear*, 564 U.S. at 919). The United States
Supreme Court has stated that "[f]or an individual, the paradigm forum for the

exercise of general jurisdiction is the individual's domicile." *Id.* at 137 (internal citations and quotation marks omitted). In turn, "domicile (or citizenship) consists of two elements: residency in a state and intent to remain in that state." *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1149 (11th Cir. 2021).

The record evidence demonstrates that Muhammad does not meet these criteria. To the contrary, he is domiciled in Washington, D.C. and not otherwise subject to general jurisdiction in Florida. While Plaintiff responds that "Muhammad has not proven that he lives in Washington D.C.," his own complaint, the allegations of which the Court takes as true, alleges Muhammad "[i]s a citizen of the District of Columbia Washington DC." Doc. 110 ¶ 5.

Further, Muhammad states in his sworn declaration that he resides in Washington, D.C. and has lived in that area since 1980 with the exception of a "brief period" when he lived in North Carolina. Doc. 74-1 at 2. He has never lived in Florida and traveled to Florida "on only three occasions in the last 15 years," with no visits of more than 24 hours. *Id.* at 4. Although Muhammad has offered an online course about the life of Malcolm X, on occasion, he has never specifically directed his course to Florida or Florida residents, and is unaware of any Florida resident ever enrolling in or participating in one of the courses. Doc. 84-1.

Based on the record, Plaintiff fails to demonstrate that Muhammad's affiliations with Florida are so continuous and systematic as to render him essentially at home in the state. To the contrary, Muhammad resides in Washington, D.C. and has no intention of leaving that area. He has never owned or rented property in Florida, been

employed in Florida, or had a Florida driver's license, office, or bank account and has little to no connections with Florida. *See* Doc. 74-1 at ¶¶ 3–5. Therefore, having no other meaningful contacts with Florida, Muhammad cannot be considered "at home" in Florida and subject to general personal jurisdiction there. *Daimler*, 57 U.S. at 138–39.

### b. Specific Personal Jurisdiction

Further, Muhammad argues that specific jurisdiction over him would be improper because it would not comport with the requirements of due process. Doc. 120 at 10–11.

Muhammad argues that he did not "purposefully avail" himself of the privilege of conducting activities in Florida or have any reasonable expectation of being hailed into Court in this state. *Id.* Instead, as stated in his Declaration (Doc. 74-1 ¶ 5), he recorded and published an online video from Washington, D.C. Also, Muhammad cites authority for the proposition that a visit to a website by Florida residents, or the fact that a website is accessible in Florida, is not enough to establish targeting of Florida for purposes of specific jurisdiction. *Id.* at 11 (citing *e.g.*, *Goforit Entm't LLC v. Digimedia.com L.P.,* 513 F.Supp.2d 1325, 1330 (M.D. Fla. 2007); *Stock v. Sollars,* 2018 U.S. Dist. LEXIS 12319, at *9 (S.D. Fla. Jan. 23, 2018)).

Plaintiff argues in response that Muhammad produces a "YouTube channel that is broadcast in Florida as well as nationally. In [Muhammad's] broadcast, he solicits Florida residents' enrollment into his online course on the assassination of Malcolm X where he charges an enrollment fee." Doc. 126 at 2. Citing *Internet*

*Solutions Corp. v. Marshall*, 39 So.3d 1201 (Fla. 2010), Plaintiff asserts that posting defamatory statements about a Florida resident directed to potential readers within Florida is sufficient to constitute a tortious act in Florida.[11] *Id.* Plaintiff also makes the same conspiracy-based jurisdiction argument he did for Netflix, arguing that Fla. Stat. § 48.193(1)(a)(6) provides a basis for jurisdiction based on Netflix and Ark Media's tortious acts in Florida. *Id.* at 3–4. Lastly, Plaintiff contends that "[i]f the court does not accept the jurisdiction over Muhammad based on conspiracy, then jurisdiction can be attached based on personal contact with the venue state." *Id.* at 4.

Even if Plaintiff had made a *prima facie* showing of jurisdiction under Florida's long-arm statute, the Court agrees with Muhammad that the exercise of specific personal jurisdiction would not comply with the requirements of due process. This is because, based on Plaintiff's allegations and the sworn declarations in the record, Muhammad's alleged Florida activities do not constitute sufficient "minimum

---

[11] *Marshall* is the only authority that Plaintiff cites in his response. As discussed below, even if the Court assumed that Plaintiff established that the tortious act provision of the long-arm statute was triggered here, he fails to show "purposeful availment as to Muhammad."

In *Internet Solutions Corporation v. Marshall*, 39 So. 3d 31 (Fla. 2010), the Florida Supreme Court (on referral of a certified question from the Eleventh Circuit) analyzed the "tortious act" provision of the long-arm statute and concluded, in the context of defamation, that "although the posting of defamatory material about a Florida resident on a website alone did not constitute the commission of a tortious act . . . the posting of such that was both *accessible* and *accessed* in Florida constituted the commission of a tortious act of defamation ...." *Internet Solutions Corp. v. Marshall*, 611 F.3d 1368, 1370 (11th Cir. 2010) (emphasis in original). However, the Florida Supreme Court only addressed the "first step to the inquiry as to whether the exercise of personal jurisdiction over a non-resident defendant is proper" and not the due process issues that are determinative in this case, as discussed *infra*.

contacts" such that exercising jurisdiction over him would align with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.

The Eleventh Circuit has developed a three-part test to determine whether a defendant's contacts with the applicable forum are constitutionally minimum contacts:

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993) (citations and quotation marks omitted). *See also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (stating three-part test as: "(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice") (citations and quotation marks omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

Here, Plaintiff fails to carry his burden on the first two factors. As to the first factor, to determine whether Plaintiff's claims arise out of or relate to one of Muhammad's contacts with Florida, the Court's "inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Id.* at 1355–56 (quoting *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010)). Moreover, "a tort 'arise[s] out of or relate[s] to' the defendant's activity in a state only if the activity is a 'but-for' cause of the tort." *Waite v. All Acquisition Corp.,* 901 F.3d 1307, 1314 (11th Cir. 2018) (quoting *Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1222–23 (11th Cir. 2009)). And as a Court in this District held in *Goforit Entm't LLC v. Digimedia.com L.P.*, 513 F. Supp. 2d 1325, 1330 (M.D. Fla. 2007) (internal citation omitted), the fact that a website is "equally accessible everywhere does not establish targeting of Florida" for purposes of specific jurisdiction.

In the complaint, Plaintiff alleges only that Muhammad is engaged in "substantial and not isolated" activity within Florida, that he produced and broadcast the YouTube video (which was viewed in Florida), and that he offers an online course on the Malcolm X assassination. Doc. 110 at 5 ¶¶ 15–17. However, in the motion to dismiss and attached affidavits, Muhammad disputes the factual basis for this assertion, attesting to the fact that he has no contact with the State of Florida connected to this litigation. Docs 74-1, 84-1 (providing evidence by declaration that, among other things, he is a citizen of Washington, D.C., and has never: lived in Florida, had a Florida driver's license, telephone number or bank account; owned an office in Florida; been employed in Florida; or otherwise engaged in substantial activity in

Florida; that the YouTube video was not directed to residents in Florida and does not allow or provide opportunities for Florida viewers to purchase products or transact business; that Plaintiff has not generated any revenue from the Video, did not expect to be sued in Florida because of the video he recorded from Washington, D.C., and that he "blocked" the video from his channel after Plaintiff first contacted him).

In response to the motion to dismiss, Plaintiff points to no evidence that would negate Muhammad's assertions or evidence. Instead, Plaintiff's submissions merely demonstrate that Muhammad once traveled to Miami for a talk on the Malcolm X assassination and previously visited Fort Lauderdale to promote the series. Doc. 126 at 3. Additionally, Plaintiff makes a conclusory allegation (not competent evidence) in the form of speculation that "Muhammad and his co-defendants conspired to defame the plaintiff to protect the Florida business clientele he built for his online business and the Who Killed Malcolm X documentary." *Id.*

Thus, Plaintiff has failed to carry his burden of demonstrating that his claims arise out of or relate to Defendant Muhammad's contacts with Florida. *See Bristol-Myers Squibb Co. v. Superior Ct. of Calif.*, 137 S. Ct. 1773, 1781-82 (2017); *see also Waite*, 901 F.3d at 1315 (holding that plaintiffs did not establish that their claims arose out of or related to the defendant's contacts with Florida because none of the contacts were the but-for cause of the torts alleged); *CJS Sols. Grp., LLC v. Tokarz*, No. 3:20-cv-65-MMH-JRK, 2021 WL 848159, at *11 (M.D. Fla. Mar. 5, 2021) (even though Fla. Stat. § 48.193(1)(a)(2) was satisfied, there was no assertion or evidence on the plaintiff's tortious interference claim demonstrating that claim arose out of or related to the

subject defendant's contacts with Florida because the alleged interference occurred in California).

### Muhammad Has Not Purposefully Availed Himself of the Privileges of Doing Business in Florida

Plaintiff also fails to demonstrate the second factor, purposeful availment. There are two tests courts employ in tort cases for determining whether there is purposeful availment: the traditional minimum contacts test, and the "effects test." *See Louis Vuitton*, 736 F.3d at 1356–57. "Under the minimum contacts test for purposeful availment, [the Court] assess[es] the nonresident defendant's contacts with the forum state and ask[s] whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* at 1357 (citing *U.S. S.E.C. v. Carrillo,* 115 F.3d 1540, 1542 (11th Cir. 1997)). "In performing this analysis, [the Court identifies] all contacts between a nonresident defendant and a forum state and ask[s] whether, individually or collectively, those contacts satisfy these criteria." *Id.* (citing *King & Hatch, Inc. v. S. Pipe & Supply Co.,* 435 F.2d 43, 46 (5th Cir. 1970)). Under the second test courts can apply in cases involving intentional torts, the "effects test," "a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." *Id.* at 1356–57. "This occurs when the tort: (1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have

anticipated would be suffered in the forum state." *Id.* at 1356 (citations and quotation marks omitted) (alterations in original).

First, Plaintiff fails to establish purposeful availment under the traditional minimum contacts test. This is because, as demonstrated by Muhammad's sworn declaration, the acts for which Plaintiff seeks to hold him liable all occurred outside of Florida, Muhammad's Florida contacts are not sufficiently related to Plaintiff's causes of action, and Plaintiff has not demonstrated that Muhammad purposefully directed any allegedly tortious conduct toward Florida. *See* Doc. 74–1, 84-1. Again, in response, Plaintiff points to no competent evidence that would negate the declaration submitted by Muhammad. *See* Doc. 126.

Nor has Plaintiff affirmatively presented evidence supporting a finding that Florida was a "predictable forum" for Muhammad, or that he directed his activities to this State. *See Turi v. Stacey*, No. 5:13-cv-248-PCF-TBS, 2015 WL 403228, at *15 (M.D. Fla. Jan. 28, 2015) (finding no minimum contacts where defendants had no offices, employees, agencies, bank accounts, or property in Florida, had not met plaintiff in Florida, were not licensed to do business in Florida, did not have income from direct Florida sales, did not target Florida residents through an advertising campaign, and did not pay taxes in Florida), *aff'd*, 627 F. App'x 904 (11th Cir. 2015); *Instabook Corp. v. Instantpublisher.com,* 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006) (finding lack of personal jurisdiction where plaintiff failed to establish the requisite minimum contacts based on the defendant's operation of an interactive website

accessible in Florida and sales to only two Florida residents). Accordingly, Plaintiff has not established purposeful availment under the traditional minimum contacts test.

For similar reasons, Plaintiff does not establish purposeful availment under the effects test. Under the effects test, "the jurisdictional inquiry properly focuses on the *defendants'* relationship with the forum and the litigation." *Env't Mfg. Sols., LLC v. Fluid Energy Grp., Ltd.*, No. 6:18-cv-156-PGB-KRS, 2018 WL 6264836, at *4 (M.D. Fla. Nov. 30, 2018) (emphasis in original). Here, Plaintiff points to no evidence connecting Muhammad to Florida in a "meaningful way," such as by demonstrating that he targeted the statements in question at Florida. *See Buzz Pop Cocktails Corp. v. Booze Pops, LLC*, No. 8:19-cv-1840-MSS-TGW, 2020 WL 2838825, at *7 (M.D. Fla. Apr. 22, 2020).

Under the effects test, merely alleging that a plaintiff suffered an injury in the forum state is insufficient to satisfy the dictates of due process. *See Walden v. Fiore*, 571 U.S. 277, 278 (2014); *see also Buzz Pop Cocktails Corp.*, 2020 WL 2838825, at *7 (applying the effects test and finding that personal jurisdiction could not be premised solely on the injury that the plaintiff suffered in Florida as a result of the infringement); *Env't Mfg. Sols., LLC*, 2018 WL 3635112, at *9 (applying the effects test and stating that "Plaintiffs rely entirely on the fact that Defendants allegedly committed intentional torts that they knew would harm Plaintiffs in Florida. But . . . the proper question is not whether Plaintiffs experienced injury in Florida but whether *Defendants' conduct* connects them to Florida in a meaningful way. Here, the only connection to Florida is that Defendants allegedly knew that their communications . . . to Plaintiffs'

customers (which are also not located in Florida) would injure Plaintiffs in Florida.
That is not enough.") (emphasis added)) *report and recommendation adopted*, 2018 WL
6264836 (M.D. Fla. Nov. 30, 2018); *Syndaver Labs, Inc. v. Pecoraro*, No. 8:17-cv-1984-
JSM-TGW, 2017 WL 10299465, at *3 (M.D. Fla. Dec. 20, 2017) (applying *Walden*
and determining that under the effects test, an argument that the defendant harmed a
Florida resident was insufficient to establish personal jurisdiction).

Additionally, as Muhammad argues on reply, *Moore v. Cecil* (an Eleventh Circuit
case analyzing the exercise of personal jurisdiction under the Due Process Clause in a
defamation case) is relevant here. *See* Doc. 138 at 3–4. There, the Court held that to
satisfy the effects test in an out-of-state defamation case, a plaintiff must show that the
forum state is the "focal point" of the communications in question by way of evidence
that the publication was directed at the state or that the Plaintiff intended to target that
state's audience as opposed to his followers or a national audience generally. *Moore*,
109 F.4th at 1364.

Further, the *Moore* Court notes that:

> Social media and internet-based activities present a unique context for
> assessing personal jurisdiction under *Calder*. While we do not have any
> published case law directly addressing the application of the *Calder* effects
> test in the social media context, many of our sister circuits have addressed
> this issue, and we find their analysis persuasive. Those circuits have
> uniformly held that in determining whether the allegedly defamatory
> comments or information was directly aimed at the forum, the court must
> look to the defendant's focus, purpose, and/or intent in posting the
> information . . . Mere knowledge that the effects of the defendant's
> conduct would be felt in the forum state, without more, is
> insufficient. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d
> 1063, 1077 (10th Cir. 2008) ("[U]nder the *Calder* test[,] plaintiffs ... must

establish ... not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state*." (emphasis in original)); *see also Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 972 (10th Cir. 2022) (explaining that the second prong of *Calder* effects test focuses "on whether the defendant's allegedly tortious conduct was focused on or directed at the forum state—not ... on whether the defendant's wrongful conduct was focused on or directed at the interests of plaintiffs who reside in or otherwise have significant connections to the forum state").

Thus, where the out-of-state defendant deliberately directs his posting at the plaintiff or at an audience in the forum state, then the "directly aimed at the forum" prong of the *Calder* effects test is satisfied. . . . But where there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically, then the *Calder* effects test is not satisfied. *See, e.g.*, *Blessing v. Chandrasekhar*, 988 F.3d 889, 906–07 (6th Cir. 2021) (holding that the court lacked personal jurisdiction where "[t]here [was] no evidence that the defendants posted the tweets hoping to reach [the forum state] specifically as opposed to their Twitter followers generally").

Here, Plaintiff makes no allegation that Muhammad targeted the YouTube video at Florida specifically, and he in fact acknowledges in his response that Muhammad "produces a YouTube channel that is broadcast in Florida as well as nationally." Doc. 126 at 2. Plaintiff's allegations are therefore merely that Muhammad "produced and broadcasted a YouTube Live Video accessed and viewed in Florida by Florida residents, including members of the Plaintiffs' [sic] community." Doc. 110 at 5 ¶ 16.

Thus, under the effects test as described in *Calder* and *Moore*, Plaintiff's claims fail because there is no evidence that Muhammad posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state

specifically. Under the minimum contacts test, Plaintiff fails to establish purposeful availment because he does not identify contacts Muhammad has with Florida that are: (1) related to the claims in this case; (2) involve some act by which Muhammad purposefully availed himself of the privileges of doing business in Florida; and (3) are such that he should reasonably anticipate being haled into court in Florida. *See Louis Vuitton*, 736 F.3d at 1356–57. Because Plaintiff has not met his burden of showing purposeful availment under either test, Muhammad is not subject to the specific jurisdiction of the Court.

### C. Failure to State a Claim

Finally, the Ark Media Defendants move for dismissal, arguing that the applicable New York statute of limitations expired before Plaintiff filed this case. The Court agrees that New York law applies and bars Plaintiff's claims.

#### *Statute of Limitations*

The Ark Media Defendants move to dismiss for failure to state a claim upon which relief can be granted. Doc. 118 at 2.  They argue: (1) that Plaintiff's claims are time-barred under New York law; (2) that even if Florida law applied, he "fails to allege that the Ark Media Defendants made any false and defamatory statements about him and fails to allege any basis for holding them liable for the statements of others;" (3) even if the statements in the Video could be attributed to the Ark Media Defendants, the statements are protected as "pure opinion" under the First Amendment; and (4) that he is a limited-purpose public figure who must allege that the statements were made with actual malice, which he has not. *Id.*

In Plaintiff's response, he agrees that he is a limited-purpose public figure based on his press conference (Doc. 127 at 6–7) and states that Defendants "acted with malice because they knew that the statements were false or had a high degree of awareness of probable falsity." *Id.* at 2. Plaintiff argues that the Ark Media Defendants knew the letter was authentic because they would not have offered to purchase Raymond Wood's life rights if they thought the letter was fake. *Id.* at 3.

The response also includes a section entitled "Argument opposing motion to remove to New York State," which appears to be an argument that Florida's statute of limitations should apply, not New York's. *Id.* at 8–9. In this section, Plaintiff makes several arguments for why Florida has more significant ties to this case than New York: for instance, he contends that Florida law should apply because certain negotiations with the Ark Media Defendants were conducted from Florida. [12] *Id.*

In their reply, the Ark Media Defendants contend that Plaintiff's opposition is based on unpleaded factual assertions that should not be considered, and that he still fails to state a claim against them even if the Court considers his new allegations. Doc. 131 at 2–3. They reiterate their argument that New York's one-year statute of limitations bars his claim and that they should not be held liable for the statements in the Video. *Id.* at 3–6.  They also argue that Plaintiff failed to dispute, and thus

---

[12] Plaintiff also responds to Ark's First Amendment argument. *Id.* at 9–10. First, he states that he was not a limited-purpose public figure when Bertelson contacted Malcolm X's family on February 16, 2021, because the press conference had not occurred, and his book had not been published. *Id.*  Plaintiff alleges that the Ark Media Defendants "maliciously discredited and slandered" him with the knowledge that their statements were false. *Id.* at 10.

45

concedes, that the video statements constitute non-actionable opinion and that he
failed to plead harm stemming from the statement Bertelson allegedly made to a
representative of Malcolm X's family. *Id.* at 5–7.

### Choice of Law and Statute of Limitations

The Ark Media Defendants argue Florida law "borrows" the statute of
limitations from the state where a cause of action arises, based on which state has the
"most significant relationship" with the case. *Id.* at 9–10 (citing Fla Stat. § 95.10;
*Celotex Corp. v. Meehan*, 523 So. 2d 141, 146 (Fla. 1988)). They point out that it is
undisputed Plaintiff filed this action nearly twenty months after the last-in-time
defamatory statement, made in a YouTube Video on March 14, 2021. *Id.* at 9. Since
New York applies a one-year statute of limitations to defamation claims, as described
below, Plaintiff's claims are time-barred.[13]

Defendants argue that New York's statute of limitations should govern this case
because: (1) the only connection to Florida is Plaintiff's residency; (2) his injury
primarily occurred in and has the most connection with interests outside Florida; (3)
his claims are primarily based on conduct carried out in or focused on New York; (4)
the citizenship of the Parties considered as a whole favors application of New York
law; and (5) the Parties' relationship was centered in New York. *Id.* at 9–14.

---

[13] Defendants' representations about New York's statute of limitations are accurate and
unchallenged. *See* N.Y. CPLR § 215(3); *Patterson v. Balsamico*, 440 F.3d 104, 112 n.4 (2d Cir.
2006) (applying one-year limitations period to intentional infliction of emotional distress
claims based on defamation).

Plaintiff's response cites no authority and includes a number of new allegations. *See* Doc. 127. Relevant to the choice of law issue, he alleges that the Ark Media Defendants traveled to Florida and stayed there for several days when trying to buy the rights to his uncle's letter. *Id.* at 3–4. For the first time, he includes a quote alleging that what Defendants told an agent for Malcolm X's family on February 16, 2021, was that "Reggie Wood is not credible and the letter is fake." *Id.* at 4. Plaintiff asserts that Defendants Muhammad and Kelly Wood are not residents of New York, that Kelly Wood gave her interview on New York local news while in South Carolina, and that the NDA should not be considered. *Id.* Additionally, he claims that the Ark Media Defendants' location at the time of the defamation is "questionable" and that the argument that New York is "the best venue" for this case should be rejected. *Id.* at 5.

In reply, the Ark Media Defendants maintain that the Court should not consider the newly asserted factual allegations in Plaintiff's Response, and that—even if considered—these allegations would not change the fact that New York has the most significant relationship to Plaintiff's claims. Doc. 131 at 1–4.

Under Florida law, the state with the "most significant relationship to the case" supplies the relevant statute of limitations. *Celotex Corp. v. Meehan*, 523 So. 2d 141, 144 (Fla. 1988); Fla. Stat. § 95.10 (2023). Here, the four-factor test, guidance in the Restatement of Conflict of Laws, and relevant caselaw favor the application of New York law.

The Florida "borrowing" statute provides that a suit cannot be brought in Florida where the claims arose in a different state or country and are barred by the

statute of limitations of that jurisdiction. Fla. Stat. § 95.10 (2023). The four contacts governing the most significant relationship test are: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *Meehan*, 523 So. 2d at 144. Courts also apply several additional factors in defamation and multi-state defamation matters, as discussed below.

Defendants contend that the first factor is at best neutral because Plaintiff's injury primarily occurred in and has the most connection with interests outside Florida. Doc. 118 at 10–11.

Regarding the second factor, Defendants note that Plaintiff's claims are based primarily on conduct carried out from or focused on New York. *Id.* at 12–13. They emphasize that the alleged conspiracy was organized in response to Plaintiff's press conference (in New York), and that Plaintiff publicly alleged at that conference that a former (New York) detective claimed to have played a role in a plot to assassinate Malcolm X (in New York). *Id.* at 12. Further, the Ark Media Defendants note that they are the only Defendants alleged to have interacted with Plaintiff, and that they are all based in New York. *Id.* The Defendants also note that Plaintiff alleges the statements to Malcolm X's family were made from New York in an attempt to derail the press conference. *Id.* Finally, they underscore that Plaintiff includes allegations about an interview Kelly Wood participated in with a New York local news channel,

allegedly to pressure Plaintiff into signing a deal with them. Thus, they argue that the second favor heavily favors application of New York law. *Id.* at 12.

The Ark Media Defendants argue that factor three similarly favors application of New York law because Plaintiff sues three defendants based in New York and one each from California, the District of Columbia, and South Carolina. *Id.* at 13. Finally, they contend that the Parties' relationship was centered in New York. *Id.*

In response, Plaintiff argues that his residence ties the case to Florida, that the Ark Media Defendants traveled there to solicit a contract with him, that Kelly Wood gave her interview from South Carolina, and that the NDA should not factor into the Court's analysis. Doc. 127 at 4–5. Finally, he asserts that the documentary was not solely produced in New York and that Defendants' location at the time of the defamation is "questionable" based on out-of-state projects Ark Media was allegedly working on at the same time. *Id.* at 5. Therefore, Plaintiff argues New York law should not apply.

Defendants reply that the Court should not consider Plaintiff's ten-plus new allegations in his response. Doc. 131 at 1. Nonetheless, they contend that even if the Court were to consider those new allegations, it is clear that New York law should apply. *Id.* at 3–4.

Plaintiff's main argument, according to Defendants, is that Florida law should apply because he lives there. However, in comparison to the other factors, they assert that his residence is of little importance. In particular, because Plaintiff alleges that "a New York-based conspiracy was formed to support a Documentary produced by a

New York company about a New York event and that the conspirators accomplished their goal by using New York speakers to try to stop his New York press conference, by coordinating a New York TV station interview, and by posting a YouTube video allegedly orchestrated by the conspirators, a plurality of whom reside in New York." Doc. 131 at 3–4.

Defendants are correct that Florida courts weigh the four factors outlined in *Meehan* to determine which state bears the most significant relationship to the case and, therefore, which state's law is applicable. *See* Fla. Stat. § 95.10 (2023); *Meehan*, 523 So. 2d at 144.[14]

When conducting a choice of law analysis, this Court follows the "most significant relationship" test from the *Restatement (Second) of Conflict of Laws* ("Restatement"), and in multistate defamation cases, Restatement § 150 provides further guidance. *See Frey v. Minter,* 829 F. App'x 432, 435 (11th Cir. 2020).

Under Restatement § 150:

(1) The rights and liabilities that arise from defamatory matter in . . . [an] aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement] § 6.

(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

---

[14] The four factors of the most significant relationship test "are considered according to their relative importance with respect to the particular issue." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (internal quotation marks omitted).

Restatement (Second) of Conflict of Laws § 150.

Aggregate communications are those published simultaneously in two or more states. A "typical Internet publication, where access is generally available to anyone at any time" is considered an aggregate communication. *See Pendergrass v. ChoicePoint, Inc.,* Civil Action No. 08–188, 2008 WL 5188782, at *3 (E.D. Pa. Dec. 10, 2008) (citing *Oja v. U.S. Army Corps of Eng'rs,* 440 F.3d 1122, 1133 (9th Cir. 2006)). All but one of the statements at issue are aggregate communications because they appear in a YouTube video.

Restatement § 150(2) creates a presumption that the law of the state where a plaintiff resides applies unless there are "significantly sufficient considerations" under Restatement §§ 6 and 145 to overcome this presumption. Seven potentially relevant factors listed in § 6 are: "(1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of result; and (7) ease in the determination and application of the law to be applied." *Plath v. Malebranche,* 351 F.Supp.2d 1338, 1341 (M.D. Fla. 2005) (quoting Restatement (Second) of Conflict of Laws § 6 (1971)). In considering these factors, four contacts are considered: the place where the injury occurred, the place where the conduct causing the injury occurred, the residence, place of incorporation, and place of business of the parties, and the place where the parties' relationship is centered. *Grupo Televisa,* 485 F.3d at 1240.

Further, in multistate defamation cases, the state of the plaintiff's domicile is not necessarily the state of most significant relationship "if one of the other states [in which the defamatory statement was published] has a more significant relationship to the occurrence and the parties." *Frey*, 829 Fed. Appx. at 434. This may be the case where (1) the plaintiff is better known in that state than the state of his domicile; (2) the statement was "related to an activity of the plaintiff that is principally located in [that] state;" (3) "the plaintiff suffered greater special damages in [that] state than in the state of his domicil;" or (4) the statement's place of principal circulation was in the non-domicile state. *See id.; see also Michel*, 816 F.3d at 694.

Based on the considerations in § 145, and focusing on the remaining Parties to the case, the relevant contacts are Florida and New York. As Plaintiff and the Ark Media Defendants focus on only these two states, the Court will do likewise. Because the most significant relationship test favors application of New York law, the Court finds that New York's one-year statute of limitations applies to bar Plaintiff's claims against the Ark Media Defendants. *See* N.Y. C.P.L.R. § 215(3).[15]

### a. The place where the injury occurred

"The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).

---

[15] As Defendants note, "[t]he New York courts have held that a claim for damages for intentional infliction of emotional distress is subject to the one-year statute of limitations in C.P.L.R. Section 215(3)." *Patterson v. Balsamico*, 440 F.3d 104, 112 n.4 (2d Cir. 2006); Doc. 56 at 17.

The injuries in this case, however, have not occurred in one particular state. First, the majority of Plaintiff's alleged injuries are not specific to Florida. *See generally* Doc. 110. For example, the statements attacking Plaintiff's credibility and the authenticity of his uncle's confession from the Ark Media Defendants to representatives of Malcolm X's family were allegedly made "to discredit [him]" (*id.* at 18 ¶ 56), to "derail the press conference" in New York (*id.* at 9 ¶ 31) , and to "accus[e] [Plaintiff] of committing the crimes of fraud and forgery by creating a fake letter and warning against proceeding with the scheduled press conference." *Id.*

Plaintiff's listed damages are (in order): broken-off talks with "multiple major agencies to produce multiple potential blockbuster projects," a depreciation of the value of his intellectual property, and the "derailment" of three potential film series and Plaintiff's book. *Id.* at 19–20. Finally, Plaintiff notes that he and his family have "hire[d] personal security as a result of the defendant [sic] encouraging its followers to hate and despite the Plaintiff" and also missed out on unspecified opportunities, events, and travel due to security requirements. *Id.* at 20.

These injuries, as pleaded, did not occur in a single state. Harm to Plaintiff's credibility and reputation would conceivably have occurred across the entertainment industry rather than solely in Florida and New York. As Plaintiff is a Florida resident, however, his emotional injuries and need to hire personal security have arisen in this state. However, the end of his communications with agencies regarding potential projects is likely not limited in geographic scope to one state.  Because the injuries are not restricted to or focused on any particular state, this factor is neutral.

Moreover, videos and articles posted online (on platforms such as YouTube) are easily accessible worldwide, not just in the forum state. Consequently, courts in this Circuit have stated that, "there is 'little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . in the case of multistate defamation.'" *Nix v. ESPN, Inc.,* No. 1:18-CV-22208-UU, 2018 WL 8802885, at *4 (S.D. Fla. Aug. 30, 2018) (quoting Restatement (Second) of Conflicts of Laws § 145 cmt. e (1971)).

Therefore, while Plaintiff alleges some harm in Florida, a significant portion of his damages appears connected to interests *outside* of Florida, including millions of dollars lost due to the Defendants' interference with multiple film and television projects. Doc. 110 at 19 ¶¶ 59–60. This factor is thus neutral and inconclusive. *See Jaisinghani v. Capital Cities/ABC*, 973 F. Supp. 1450, 1452 (S.D. Fla. 1997) (finding that Plaintiff's alleged harms were not "unique to Florida" but instead national in scope); *see also Klayman v. Jud. Watch, Inc.,* 2008 U.S. Dist. Lexis 130820, at *11–12 (S.D. Fla. Sep. 30, 2008) (finding the first factor to be "inconclusive" where the actionable publication was circulated nationally and the plaintiff's damages were national in scope).

#### b. *The place where the conduct causing the injury occurred*

The conspiratorial acts and defamatory conduct in this case include: (1) statements made in a video; (2) a New York-based NY television appearance by Defendant Kelly Wood; (3) the disclosure by Bertelson and Ark Media of confidential information to representatives of Malcolm X's family in an attempt to "derail"

Plaintiff's New York press conference; and (4) Defendants' conspiracy to "aggressively" share the YouTube live broadcast on social media. Doc. 110 ¶¶ 30, 38, 41-58, 60, 86.

The Ark Media Defendants' key actions in furthering the alleged conspiracy and defamatory statements all appear to be centered in New York. Although Plaintiff alleges they visited him in Florida, this occurred *before* the defamatory acts took place. Moreover, the Ark Media Defendants (based in New York) allegedly defamed Plaintiff via phone call from New York, coordinated Kelly Wood's news appearance on a New York news channel and allegedly conspired to produce and share Muhammad and Kelly Wood's YouTube video from New York.

Thus, although Plaintiff's response (Doc. 127) emphasizes that he was visited in Florida by Dretzin and Bertelson, neither his defamation claims nor the alleged conspiracy was centered on the Florida visit. Instead, the most significant conduct in furtherance of the conspiracy took place in New York. *See Alexksej Gubarev, et a. v. BuzzFeed, Inc., et al.,* No. 1:17-cv-60426-UU (S.D. Fla.) [ECF No. 171] at 8 (noting this factor favored applying New York law because the decision to publish the allegedly defamatory material was made in New York); *see also Wilkow v. Forbes, Inc.*, No. 99 C 3477, 2000 WL 631344, at *6 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001) (concluding the "injury-causing conduct occurred in New York" where the newspaper and reporter who published the allegedly defamatory article were both located).

Overall, this factor weighs in favor of applying New York law as the allegations indicate that the conduct (and in particular the Ark Media Defendants' conduct) occurred in and arose from actions in New York, not Florida.

### c.   *The domiciles of the parties*

Besides Plaintiff, the parties are domiciled outside of Florida and a plurality are citizens of New York. In particular, the three Defendants whose motion the Court now considers are all New York citizens. *See* Doc. 110 at 2–3 ¶¶ 3–8.

While this factor is of relatively less significance, it does weigh slightly in favor of New York. *Cf. Nix*, 772 F. App'x at 811 (noting that the third factor was "neutral because all parties were from different locations"). Considering that the claims against Muhammad and Netflix will be dismissed for lack of personal jurisdiction, this may tip the scales further in favor of applying New York law.

### d.   *The place where the relationship between the parties is centered*

This factor is neutral. On the one hand, Plaintiff alleges that the moment he entered the public forum (and became a limited-purpose public figure) was when he gave a televised New York press conference about the confession letter, flanked by a prominent attorney and relatives of Malcolm X. Doc. 110 ¶ 31. He asserts that Defendants' tortious acts were aimed directly at rebutting his press conference and the letter. Additionally, three of the parties are domiciled in New York, the press conference and extensive news coverage of it took place in New York, and Kelly Wood's news interview was with a New York-based channel.

On the other hand, Plaintiff alleges that the Ark Media Defendants visited him in Florida to discuss a possible sale of intellectual property. Ultimately, this factor is neutral because the Parties met and interacted in Florida, but at the center of the case and Plaintiff's claims is his press conference and the conspiracy to derail it, which took place in New York.

e. *Special Multistate Defamation Considerations*

The previous factors weigh slightly in favor of applying New York law, on the whole. The considerations specific to multistate defamation claims, however, strongly support that New York has the most significant relationship to this case and its law should apply.

These factors are whether: (1) "the plaintiff is better known in that state than the state of his domicile;" (2) the statement was "related to an activity of the plaintiff that is principally located in [that] state," (3) "the plaintiff suffered greater special damages in [that] state than in the state of his domicile," or (4) the statement's place of principal circulation was in the non-domicile state. *See id; see also Michel*, 816 F.3d at 694. *Frey v. Minter,* 829 F. App'x 432, 435 (11th Cir. 2020).

These factors weigh in favor of applying New York law. By all indication, Plaintiff's highly-publicized New York press conference and the surrounding news coverage by outlets in New York and Washington D.C. would suggest that Plaintiff is better known in New York than Florida. Second, the defamatory statements clearly related to an activity of his "principally located in [New York]," the unveiling of the confession letter at a public press conference. The third factor (which focuses on

damages) would be neutral at best for Plaintiff or slightly weigh against the application of Florida law because the majority of damages relate to lost book or movie deals and harm to his reputation with the family of Malcolm X, none of which are Florida specific. Lastly, whether the statements received greater circulation in New York or Florida is not something the Parties have presented evidence on.

Most obviously, the defamatory statements and alleged conspiracy were targeted directly at an activity of Plaintiff's that was "principally located in [New York]"—the choreographed reveal of his uncle's confession letter at the New York press conference and his entry into the public and media's discussion of the assassination. Therefore, these special factors weigh in favor of New York law.

Finally, public policy favors application of New York's statute of limitations. This is because the purpose of Florida's borrowing statute is to "prevent forum shopping" and to preclude litigation in Florida that would be barred in the jurisdiction where the cause of action arose. *See Jaisinghani*, 973 F. Supp. at 1452; *Alvarez v. Skinner,* No. 13-21286-CIV, 2014 WL 12675058, at *7 (S.D. Fla. May 19, 2014)

For the foregoing reasons, the greater weight of the facts supports the application of New York law; therefore, the claims must be dismissed pursuant to New York's one-year statute of limitations. As the allegedly defamatory material was published on March 14, 2021, and this case was not brought until October 24, 2022, the claims against the Ark Media Defendants are due to be dismissed, with prejudice. *See Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir. 1993) (leave to amend properly denied where statute of limitations would bar amended complaint).

## CONCLUSION

The Court grants the motions to dismiss as to Defendants Netflix and Muhammad, without prejudice, because Plaintiff has failed to establish personal jurisdiction. A dismissal on jurisdictional grounds, as opposed to a merits dismissal, cannot form the basis for a dismissal with prejudice. *See Republic of Panama v. BCCI Holdings (Lux.) S.A.,* 119 F.3d 935, 940 (11th Cir. 1997) (citing *Madara v. Hall,* 916 F.2d 1510, 1514 n.1 (11th Cir. 1990)). *Marsalis v. STM Reader, LLC,* 806 F. App'x 748, 752 (11th Cir. 2020). As to the Ark Media Defendants, the Court will dismiss the complaint with prejudice because Plaintiff's claims are time-barred and amendment would be futile.

Accordingly, it is **ORDERED**:

1. Netflix's Motion to Dismiss (Doc. 117) is **GRANTED without prejudice for lack of personal jurisdiction**.

2. Muhammad's Motion to Dismiss (Doc. 120) is **GRANTED without prejudice for lack of personal jurisdiction**.

3. The Ark Media Defendants' Motion to Dismiss (Doc. 118) is **GRANTED with prejudice**.

4. On November 14, 2022, Plaintiff filed a return of service as to Kelly Wood stating that she was served on November 1, 2022. Doc. 8. Under Fed. R. Civ. P. 12(a), a defendant must file a responsive pleading within 21 days after service. To date, Kelly Wood has neither appeared in this action, nor

filed a responsive pleading.  A party who fails to plead or otherwise defend may have a clerk's default entered against them. *See* Rule 55(a), Fed. R. Civ. P. Local Rule 1.10(b), Middle District of Florida, provides that a party entitled to a default must apply for a default within 28 days after a party's failure to plead or otherwise defend.  Further, the failure to comply with this deadline can result in dismissal of the action. Local Rule 1.10(d).  To date, Plaintiff has not filed a motion for clerk's default as to Defendant Kelly Wood. Therefore, Plaintiff is ordered to **SHOW CAUSE**, by a written response filed within **fourteen (14) days**, as to why this action should not be dismissed as against Kelly Wood for failing to timely act under Local Rule 1.10 and move for a clerk's default. Failure to timely respond to the Order to Show Cause may result in the dismissal of this action as to Kelly Wood.

**DONE** and **ORDERED** in Tampa, Florida on March 25, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties